IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

NORA FOOTE                          )
                                    )
v.                                  )      No. 3:06-0686
                                    )      Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION      )


To:  The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §§
405(g) and 1383(c), to obtain judicial review of the final
decision of the Commissioner of Social Security denying
plaintiff's applications for disability insurance benefits
("DIB") and supplemental security income ("SSI") benefits, as
provided under Titles II and XVI of the Social Security Act ("the
Act"), as amended.

        On February 25, 2008, this case was transferred to the
docket of the undersigned Magistrate Judge by Order of the Chief
Judge (Docket Entry No. 19).

        The case is currently pending on plaintiff's motion for
judgment on the administrative record (Docket Entry No. 11), to
which defendant has responded (Docket Entry No. 15).  In further
support of her motion, plaintiff has filed a reply (Docket Entry
No. 16) to defendant's response.  Upon consideration of these
papers and the transcript of the administrative record, and for

1

the reasons given below, the undersigned recommends that plaintiff's motion be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

## I.  Introduction

Plaintiff filed her applications for benefits on March 12, 2002 (Tr. 55, 300), alleging the onset of disability as of June 1, 1997, due to problems with diabetes, her heart, back, inner ear, and eyesight, in addition to high blood pressure, shortness of breath, and anxiety (Tr. 74).  Plaintiff's claims were denied on the documentary record by the state agency component of the Social Security Administration, upon initial review and again following plaintiff's request for reconsideration (Tr. 39-46).  Plaintiff thereafter requested a *de novo* hearing of her claims by an Administrative Law Judge ("ALJ").  The case came to hearing on May 5, 2004, when plaintiff appeared, with counsel, and gave testimony upon examination by counsel and the ALJ (Tr. 317-34).  The ALJ took the case under advisement until August 27, 2004, when he issued a written decision wherein he concluded that plaintiff was not disabled under the Act (Tr. 16-25).  The decision contains the following enumerated findings:

1.   The claimant met the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(I) of the Social Security Act

and was insured for benefits through December 31, 2001.

2.  The claimant has not engaged in substantial gainful
    activity since the alleged onset of disability.

3.  The claimant's obesity is a "severe" impairment, based
    upon the requirements in the Regulations (20 CFR §§
    404.1520 and 416.920).

4.  This medically determinable impairment does not meet or
    medically equal one of the listed impairments in
    Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations
    regarding her limitations are not totally credible for
    the reasons set forth in the body of the decision.

6.  The claimant has the following residual functional
    capacity:  full range of light work.

7.  The claimant's past relevant work as child care
    "director" and housekeeper did not require the
    performance of work-related activities precluded by her
    residual functional capacity (20 CFR §§ 404.1565 and
    416.965).

8.  The claimant's medically determinable obesity does not
    prevent the claimant from performing her past relevant
    work.

9.  The claimant is not under a "disability" as defined in
    the Social Security Act, at any time through the date
    of the decision (20 CFR §§ 404.1520(f) and 416.920(f)).

(Tr. 24)

        On June 30, 2006, the Appeals Council denied

plaintiff's request for review of the ALJ's decision (Tr. 5-7),

thereby rendering that decision the final decision of the

Commissioner.  This civil action was thereafter timely filed, and

the Court has jurisdiction.  42 U.S.C. §§ 405(g), 1383(c). If the

Commissioner's findings are supported by substantial evidence,

3

based on the record as a whole, then these findings are
conclusive.  Id.


## II.  Review of the Record[1]

### A.  Medical Evidence

On March 1, 1999, a chest x-ray due to complaints of
chest pain revealed mild pneumonia (Tr. 218).  On March 16, 1999,
Dr. Kermit Brown, Ms. Foote's treating physician, indicated that
Ms. Foote had been totally incapacitated from February 27, 1999
until March 21, 1999, but had recovered sufficiently to return to
her regular duties on March 22, 1999, without restrictions (Tr.
213).  On November 10, 1999, Dr. Brown treated Ms. Foote's left
ear, and noted that her lungs, heart, musculoskeletal, and all
other systems were normal; he noted her weight was 311 pounds,
and counseled Ms. Foote at length on the need to diet and
exercise (Tr. 211-12).  On December 9, 1999, Ms. Foote had left
ear pain and complained of knee pain (Tr. 209).  Dr. Brown noted
that Ms. Foote was obese, had non-insulin dependent diabetes,
bronchial asthma, clear lungs, normal respiratory and
cardiovascular systems, and controlled hypertension; he advised
Ms. Foote to check her blood sugar daily (Tr. 209-10).

On February 8, 2000, Ms. Foote complained of pain and

---

[1]The following record review is taken from defendant's brief, Docket
Entry No. 15, pages 1-11.

4

swelling in her right leg when she walked (Tr. 204). Dr. Brown observed that a venous doppler in September 1999 did not reveal any blood clot, and she had not filled a Naprosyn prescription (Tr. 204). Her cardiovascular, respiratory, and musculoskeletal systems were normal, her lungs were clear, her heart was normal, she had minimal pedal edema, and her hypertension was well controlled (Tr. 203-04). However, her diabetes was uncontrolled and Dr. Brown advised Ms. Foote to check her blood sugar before breakfast and dinner (Tr. 203). On June 9, 2000, Ms. Foote reported that she was "doing okay" and she denied chest pain or shortness of breath, but had some ankle swelling (Tr. 201). Dr. Brown found that her lungs were clear, her heart was normal, and her hypertension was controlled, and he started her on a new diet and Glucophage for diabetes (Tr. 200). In August 2000, Dr. Brown observed that Ms. Foote's lungs and heart were normal, she had no edema, and that her diabetes was finally controlled (Tr. 196). In September 2000, he observed that her lungs were clear, her heart was normal, her hypertension was fully controlled and her diabetes was well controlled (Tr. 194).

On February 14, 2001, Ms. Foote complained of dyspnea on exertion, and Dr. Brown observed that she had quit smoking three years previously (Tr. 193). Exam revealed that her chest, lungs, heart, and extremities were normal (Tr. 192). An exercise test on February 20, 2001, stopped voluntarily due to fatigue,

5

indicated no cardiac symptoms, and was negative for angina (Tr. 119). On February 21, 2001, Ms. Foote reported no more chest pain, and Dr. Brown observed that an echocardiogram was within normal limits (Tr. 190, 191). He observed that Ms. Foote was not in distress, was clinically stable with normal chest, lungs, heart, and extremities, with no edema, and that he refilled her medications (Tr. 189). On April 18, 2001, Dr. Brown observed that Ms. Foote was healthy looking, that her chest, lungs, heart, and extremities were normal, and that her hypertension was controlled but her diabetes was not (Tr. 187).

On February 7, 2002, Ms. Foote was seen at Centennial Medical Center for complaints of chest pain, and received instant relief when given nitroglycerin (Tr. 182-186). It was noted that she had a remote history of asthma (Tr. 184), was diabetic, obese, and hypertensive (Tr. 292), but had no history of coronary disease or angina, had never been evaluated for cardiac problems, and she denied hemoptysis, palpitations, dyspnea, edema, or syncope (Tr. 182, 292, 296). Exam revealed no blur or other visual difficulty and her legs were normal, her lungs were normal, and her extremities had no swelling, cyanosis, or weakness (Tr. 182, 296). Her heart was tachycardic with normal S1, S2, and it was noted that an EKG showed sinus tachycardia, but no evidence of ischemia, injury or infarction (Tr. 182, 294, 297). Dr. Brown diagnosed acute chest pain, non-insulin

6

dependent diabetes, and obesity (Tr. 183). A left heart catheterization on February 7, 2002, revealed no evidence of significant disease, but only what was interpreted as non-obstructive coronary artery disease (Tr. 272, 298). A thallium stress test was abnormal (Tr. 272, 290).

On February 19, 2002, Ms. Foote presented to Centennial Medical Center with lower abdominal pain and a hard clot in her right groin (Tr. 125). It was noted that a cardiac catheterization due to angina revealed no significant coronary disease (Tr. 125). Her lungs and heart were normal, her extremities had no swelling, she had no difficulty seeing, denied chest pain, and it was noted that anginal chest pain had responded to nitroglycerin (Tr. 125, 126, 131-32). She was tender in the right groin with a small lesion at the site of the angiogram catheterization (Tr. 131-32). A chest x-ray indicated borderline cardiomegaly with no other active disease and no appreciable change from February 7, 2002 (Tr. 130). Dr. Brown assessed a urinary tract infection and coronary artery disease (Tr. 125). On February 20, 2002, a ventilation/perfusion lung exam due to shortness of breath complaints showed no evidence of pulmonary thromboembolic disease (Tr. 123). A bilateral lower extremity venous doppler performed due to complaints of abdominal and pelvic pain and bilateral leg swelling revealed no evidence of deep venous thrombosis, and a pelvic ultrasound revealed no

7

evidence of pelvic mass (Tr. 127, 128). On February 28, 2002, Ms. Foote complained of shortness of breath on exertion and that it was difficult to climb stairs (Tr. 171). Dr. Brown noted that she looked ill, her abdomen had right quadrant tenderness, but her chest, lungs, heart, and extremities were normal (Tr. 170). On March 8, 2002, Ms. Foote reported that she could not eat anything, but had no chest pain (Tr. 169). Dr. Brown determined that her chest, lungs, and heart were normal, and he ordered a stress ECG (Tr. 168).

Ms. Foote went to Centennial on March 17, 2002, for complaints of left-sided chest pain that had begun while in church (Tr. 288). It was noted that a cardiac catheterization on February 7, 2002, had shown normal left ventricular function with nonobstructive coronary artery disease (Tr. 288). Chest exam revealed good air movement, her heart had regular rate and rhythm with no murmur or gallop, and she had free range of motion with no tenderness or edema in her extremities, intact sensory and motor function and no focal deficits (Tr. 288). An EKG showed no changes when compared to the February 10, 2002 test. (Id.) She returned on April 27, 2002, due to a nose bleed, and complained of chest pain, but denied shortness of breath or any lower extremity swelling (Tr. 286). Exam revealed that she was not in respiratory distress, had regular heart rhythm, and her lungs were clear. (Id.) The doctor opined that her chest pain was

8

probably not related to cardiac etiology (Tr. 287).

Ms. Foote was evaluated by Dr. Bruce Davis, a state agency consulting physician, on June 4, 2002 (Tr. 138-43). Dr. Davis noted that she was not in acute distress, and was obese at 5'2" and 278 pounds (Tr. 138). Her eyes were normal with 20/40 uncorrected vision, her heart sounds were normal and her breath sounds were clear. (Id.) An ECG on June 4, 2002 was within normal limits (Tr. 142). A chest x-ray showed her heart size and shape were normal, lungs were normal, and her bones and soft tissues were normal (Tr. 141). Dr. Davis assessed that up to one-third of an 8-hour day Ms. Foote could occasionally lift and/or carry 20 pounds, 10 pounds frequently, and that she could sit, stand and/or walk about 6 hours in an 8 hour day, although she could stand and/or walk less than 1 hour uninterrupted, with no other limitations (Tr. 140).

On August 9, 2002, Ms. Foote complained of back pain, but denied chest pain and shortness of breath, and she advised that she had been out of her medications for 2-3 days (Tr. 158). Dr. Brown noted that her chest was clinically clear, her heart was normal, there was no ankle swelling, she had decreased range of back motion due to pain, and her diabetes was uncontrolled due to her noncompliance (Tr. 159). He completed an assessment of her ability to perform work-related activities on August 10, 2002, advising that in an 8-hour day Ms. Foote could frequently

9

lift 3 pounds; could stand and/or walk a total of 1 hour and sit a total of 1 ½ hours in an 8-hour day; could never climb, crouch, or crawl; could occasionally stoop and kneel; and could frequently balance (Tr. 152-53). He also advised that reaching and handling were done with difficulty, and that her impairment also affected feeling, as well as seeing, hearing, and speaking (Tr. 153). She was restricted from heights, moving machinery, and temperature extremes, and due to asthma, she could not be exposed to chemicals, dust, fumes or humidity, and could not be exposed to noise or vibrations due to her inner ear trouble. (Id.) Dr. Brown advised that Ms. Foote had a history of asthma, low back pain, and inner ear trouble (Tr. 153).

On August 16, 2002, Ms. Foote reported that her back pain was much better (Tr. 155). Dr. Brown noted that a lumbar spine x-ray on August 15, 2002, revealed degenerative joint disease[2] and spondylosis at L1-2 and 2-3, and he prescribed Flexeril and noted she may need an orthopedic referral (Tr. 156-57, 285). On August 29, 2002, Ms. Foote saw Dr. Brown to refill her medications and had no complaints (Tr. 261).

On October 10, 2002, Ms. Foote returned to Centennial

---

[2]Degenerative joint disease (DJD) or osteoarthritis, causes pathologic changes in the weight-bearing joints of almost all persons by age 40. See Merck at 449 (17th ed. 1999). At least 20 million adults in the U.S. suffer from DJD at any one time and by age 40, 90% of all people will have radiographic features of osteoarthritis. See David B. Hellman, M.D. *Arthritis & Musculoskeletal Disorders* in Current Medical Diagnosis & Treatment, 694-741, 697 (Lawrence M. Tierney, Jr. et al., eds., 1995).

Case 3:06-cv-00686   Document 20   Filed 05/27/08   Page 10 of 30 PageID #: 88

for complaints of chest pain (Tr. 283). After review of her
records, it was noted that she had questionable coronary artery
disease, had never actually had a heart attack or known history
of coronary artery disease, and that a recent cardiac
catheterization had revealed only minimal irregularities and no
obstructive coronary artery disease (Tr. 283). Ms. Foote had no
shortness of breath, neck or back pain, or lower extremity
swelling, had no respiratory distress, her heart had a regular
rhythm with no murmur, gallop or rub, and her lungs were clear
with equal breath sounds bilaterally (Tr. 283). An EKG was
basically normal with no signs of acute ongoing ischemia, her
oxygen saturation on room air was 100% and she was in absolutely
no respiratory distress (Tr. 284). She was diagnosed with acute
atypical chest pain, probably musculoskeletal related. (Id.)

On November 8, 2002, she complained that her reflux was
worse, and Dr. Brown noted her heart was normal, she had no
shortness of breath, her extremities had no edema with no ankle
swelling, her hypertension was controlled, and he adjusted her
medications (Tr. 258-59). On November 11, 2002, Ms. Foote had an
upper GI series which determined she had gastroesophageal reflux
disease (Tr. 281). On November 22, 2002, Dr. Brown observed that
her lungs, heart, and extremities were normal, she had no chest
pain, no shortness of breath, no ankle swelling, and her
hypertension was controlled, but her diabetes was uncontrolled

11

and he advised Ms. Foote about her diet, to check her blood sugar, and adjusted her medications (Tr. 255-56).

On February 2, 2003, Ms. Foote complained of chest pain at Centennial Medical Center (Tr. 278). She denied shortness of breath, wheezing, dysrhythmias, muscle weakness, paresthesias, or edema, and it was noted that a heart catheterization a year previously had been within normal limits. (Id.) Her vital signs were stable and within normal limits, her ears, external auditory canals were patent, her nasal nares were patent, her heart had a regular rate and rhythm, her lungs were clear to auscultation, there was no extremity swelling, and her back had no tenderness (Tr. 278-79). A chest x-ray was within normal limits, an EKG showed normal sinus rhythm and was unchanged from one performed on October 10, 2002, and her cardiac lab tests were within normal limits (Tr. 279). Ms. Foote was discharged with prescriptions for Ultram, ibuprofen, and Skelaxin. (Id.) When seen by Dr. Brown on February 3, 2003, she complained of diarrhea, but denied chest pain and shortness of breath (Tr. 252). Dr. Brown observed that her lungs, heart and extremities were normal and her hypertension was controlled; he adjusted her medications (Tr. 253).

On March 7, 2003, Ms. Foote presented to Centennial for a facial laceration received when the leg of a futon she was attempting to move over a fence hit her in the head (Tr. 275).

12

She denied any neck or back pain, and exam revealed that her chest was clear to auscultation, her heart had regular rate and rhythm, her lower extremities were not tender to palpation, she was neurologically intact with good motor function and sensation, and had 5/5 strength in all extremities (Tr. 275). A head CT scan revealed no intracranial abnormality (Tr. 275-77).

In June 2003, Dr. Brown treated Ms. Foote's left ear pain, noting she had no chest pain or shortness of breath, and no ankle swelling; her heart, lungs, and extremities were normal, and he prescribed an antibiotic for an ear infection and a nasal spray for allergic rhinitis, and noted her diabetes was uncontrolled (Tr. 250-51). Ms. Foote went to Centennial on July 13, 2003, complaining of feeling bad while in church (Tr. 271). Her blood pressure was 148/79, she had 100% oxygen saturation on room air, Accu-check was 294 (blood glucose), her lungs were clear, her heart had a regular rate and rhythm, there was no deformity, cyanosis or clubbing in her extremities and she had no gross focal deficits. (Id.) The results of her February 2002 heart catheterization were noted and updated tests were ordered (Tr. 272). She saw Dr. Brown for follow-up on July 15, 2003, reported she was feeling better and denied shortness of breath and chest pain, but complained of snoring at night and feeling depressed (Tr. 247). Her chest, heart, and extremities were normal. Dr. Brown noted her diabetes was difficult to control

13

with her blood sugar of 216 in the office and he advised her to comply with her diet (Tr. 248). He prescribed Paxil for her depression by history, and noting her questionable sleep apnea, determined it was necessary to obtain a sleep study. (Id.)

Ms. Foote saw pulmonologist Dr. Oguntolu on July 17, 2003, for evaluation of sleep apnea/chronic bronchitis (Tr. 227). Ms. Foote reported frequent awakenings, excessive daytime sleepiness, snoring, shortness of breath on exertion of approximately one flight of stairs, and occasional wheezing, but denied chest pain (Tr. 228). Dr. Oguntolu assessed morbid obesity, chronic bronchitis, sleep disordered breathing, recent hypoxemia, suspect cardiomyopathy, and a history of coronary artery disease, and recommended weight loss, evaluation of nocturnal hypoxemia, tests, and regular exercise (Tr. 229).

On August 6, 2003, Ms. Foote complained of left-sided chest pain and shortness of breath with no lower extremity swelling, neck or back pain (Tr. 269). She had no respiratory distress, her heart had regular rhythm, her lungs were clear, and her extremities had no cyanosis, clubbing, or edema, and no asymmetric swelling of her calves (Tr. 269-70). The impression was acute chest pain with a need to rule out myocardial infarction (Tr. 270). An echocardiogram on August 7, 2003, revealed mild dilated cardiomyopathy without focal segmental wall motion abnormalities, and mild tricuspid regurgitation (Tr. 232).

14

On August 15, 2003, Dr. Oguntolu reported that Ms. Foote had reported dyspnea on exertion but no dizziness (Tr. 230). He assessed mild chronic obstructive pulmonary disease, progressive dyspnea, reversible airway abnormality, obesity with snoring, and suspect cardiomyopathy (Tr. 230).

On January 9, 2004, Ms. Foote complained of a stomach ache and advised that her symptoms had begun when she moved a heavy trunk (Tr. 241). She denied any chest pain or shortness of breath, and reported that her back only hurt when she lay down. (Id.) It was noted that her depression, by history, was controlled as was her sinus rhinitis (Tr. 241). Her chest, lungs, and heart were normal, she was euphoric, had an appropriate affect, no suicidal ideations, and no nystagmus, and it was determined that Ms. Foote had abdominal muscle wall strain (Tr. 242).

On January 11, 2004, Ms. Foote presented to Centennial complaining that she had nearly passed out in church after becoming very excited about the service (Tr. 266). She reported that while singing she had felt weak, and denied chest pain, shortness of breath, any vision changes or unilateral weakness. (Id.) A check of her blood sugar by Accu-Chek revealed that it was 259. (Id.) Ms. Foote was not in acute distress, her blood pressure was 123/56, her chest had no wheezes or rales, her heart had regular rate and rhythm, her extremities had free range of

motion with no tenderness or edema, and her sensory and motor functions were intact with no focal deficit (Tr. 266). The assessment was acute syncopal episode and diabetes, tests were ordered and results were pending (Tr. 267). On March 29, 2004, Ms. Foote presented with right-sided back pain that she believed was arthritis (Tr. 263). She had increased urinary frequency, urgency, fever and chills, and dysuria. (Id.) She did not have lower or upper extremity pain and all other systems were negative. (Id.) It was noted that Ms. Foote did not appear in any acute distress, her lungs were clear to auscultation, her heart had a regular rate and rhythm, she was neurologically intact, and there was no cyanosis or clubbing in her extremities, but she had mild bilateral non-pitting edema, and right flank pain (Tr. 264). She was assessed with acute right back pain and probable urinary tract infection versus pyelonephritis, and tests were ordered. (Id.) A pelvis CT was negative (Tr. 265). She saw Dr. Brown on April 8, 2004, for complaints of right side pain, but denied chest pain, shortness of breath and ankle swelling (Tr. 238). It was noted that her heart and lungs were normal, that she had a positive straight-leg raise and was obese, and an x-ray was ordered (Tr. 239).

B.    The Evidentiary Hearing and Other Evidence

Ms. Foote testified that in her position at a child development center she was the director, and because she was

16

required to keep the children's records and fees, it was a secretarial job (Tr. 321-22, 324). She worked at Shoney's Inn as an inspector and would inspect the rooms (Tr. 323-24). Ms. Foote testified that her doctor had put her on a diet which she had been on and off for years, and she does not seem to lose weight because she does not get enough exercise (Tr. 333). Ms. Foote stated that she has been at her current weight the majority of her life. (Id.)

She has trouble with her back and is unable to stand, has arthritis in her chest, which made her think she was having a heart attack, and she has arthritis in her shoulders and neck (Tr. 325-26). She cannot lift very much, can only take about 8 or 9 steps before getting tired, can climb about three steps, and her best position is lying down (Tr. 326-27). She has the most pain in her lower back, which goes into her hip and down her right leg (Tr. 327). The pain is constant, and she takes different medications which make it hard to think (Tr. 328). She took medication for depression which is not helping and made her more depressed (Tr. 327-29). Dr. Brown talked to her about seeing a psychiatrist but she has decided to let God handle it (Tr. 328).

Ms. Foote testified that her medications make her tired, depressed, and sleepy and she sleeps during the day (Tr. 329). The morning of the hearing she did not take her

17

medications so she could stay awake and drive herself to the hearing. (Id.) She is up several times a night because her medication makes her go to the bathroom (Tr. 330). She had a blockage in her heart and was having blood clots in her legs, and her blood pressure goes up which makes her nervous (Tr. 330). Further, she has to keep her feet elevated all the time which is hard on her back, it is hard for her to get her feet down, and the medication does not seem to be doing her any good (Tr. 331). She also has an inner ear problem and her ears get infected when she goes out on the porch to sit because of the high pollen (Tr. 331).

Ms. Foote lives alone, spends her time just sitting or lying down, and is supported by her church, friends, and her sister (Tr. 331). She goes to church about twice a month, but does not go out during the week; her family brings her food, and takes her out (Tr. 332). Sometimes church members come to see her (Tr. 333).

A vocational assessment was done on September 27, 2002, which determined that based upon the ability to perform light work, Ms. Foote could perform the position of housekeeping cleaner which, according to the Dictionary of Occupational Titles 323.687-014, is a light position with an SVP of 2 (Tr. 109).

### III. Conclusions of Law

#### A. <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. <u>Jones v. Sec'y of Health & Human Servs.</u>, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. <u>Landsaw v. Sec'y of Health & Human Servs.</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." <u>Bell v. Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. <u>Hurst v. Sec'y of Health & Human</u>

<u>Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

        B.  <u>Proceedings at the Administrative Level</u>

        The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.
(5)  Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national

_____

    [3]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u> In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's <u>prima facie</u> case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. <u>See</u> <u>Varley v. Sec'y of Health & Human Servs.</u>, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. <u>See</u> 42 U.S.C. § 423(d)(2)(B); <u>Foster v. Bowen</u>, 853 F.2d 483, 490 (6th Cir. 1988).

21

C.  <u>Plaintiff's Statement of Errors</u>

Plaintiff makes an initial argument that the ultimate issue of disability should be deemed conceded by defendant, based on the particulars of his answer to plaintiff's complaint. Citing Fed.R.Civ.P. 8(d),[4] plaintiff seeks to have the Court recognize defendant's admission of her alleged disability, by virtue of his failure to either specifically admit or deny the allegations contained in ¶ 5 of the Complaint.  As defendant points out, however, the Answer's general denial of all allegations not specifically admitted (Docket Entry No. 8, ¶ 6) cures this oversight.  In any event, the argument that the ultimate legal issue in this case could be properly adjudicated upon what was plainly nothing more that an oversight in pleading is frivolous, in the undersigned's view.  <u>See</u>, <u>e.g.</u>, <u>Fed.R.Civ.P.</u> 8(e)("Pleadings must be construed so as to do justice."); <u>Fed.R.Civ.P.</u> 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); <u>Conley v. Gibson</u>, 355 U.S. 41, 48 (1957)("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading

---

[4]The cited provision is currently contained in subsection (b)(6) of Rule 8, following the 2007 amendments to the Federal Rules.

Case 3:06-cv-00686   Document 20   Filed 05/27/08   Page 22 of 30 PageID #: 100

is to facilitate a proper decision on the merits."). [5]

Regarding the substance of the administrative decision in this case, plaintiff argues that the ALJ erred in failing to call a vocational expert to testify at the hearing, citing the need for such testimony in order to establish (1) the proper characterization of her past relevant work; (2) the vocational consequences of her alleged drowsiness and resulting need to lie down during the day; and (3) the vocational consequences of the level of pain she has to endure. The latter two bases for plaintiff's argument are further addressed below, in the context of reviewing the ALJ's finding of plaintiff's residual functional capacity. However, to the extent that plaintiff asserts a *requirement* in this case for vocational expert testimony at government expense, the Sixth Circuit has definitively ruled otherwise:

> Claimant has the ultimate burden of proving the
> existence of a disability. Only when the claimant has
> established that he can no longer perform his past
> relevant work does the burden shift to the Commissioner
> to establish that the claimant retains the residual
> functional capacity to perform other substantial
> gainful activity existing in the national economy. In
> evaluating residual functional capacity, the
> Commissioner may, but is not required to, use the
> services of a vocational expert. Since in this case
> the evidence was such that the burden never shifted to
> the Commissioner to go forward with the evidence, the
> ALJ did not err in determining that the testimony of a

---

[5]The rule of <u>Conley</u>, respecting dismissal of a complaint for failure to state a claim only upon the appearance that the pleader can prove "no set of facts" that would entitle him to relief, was abrogated by the Supreme Court's decision in <u>Bell Atlantic Corp. v. Twombly</u>, 127 S.Ct. 1955, 1968-69 (2007).

vocational expert was not necessary.

Key v. Callahan, 109 F.3d 270, 274 (6th Cir. 1997)(internal citations omitted).

The ALJ here relied on plaintiff's hearing testimony to establish that her past relevant work included light, semi-skilled-to-skilled jobs and a sedentary, semi-skilled job, all as described in the Dictionary of Occupational Titles (Tr. 23). He found her capable of returning to such past relevant work at step four of the sequential evaluation process, when the burden remained with plaintiff. He was therefore not required to consult a vocational expert, and in light of plaintiff's unequivocal testimony regarding her job titles and duties, upon which the ALJ was entitled to rely, see 20 C.F.R. §§ 404.1560(b)(2), 404.1565(b), the determination of the vocational issues in this case was not erroneous.

Plaintiff further argues that the ALJ erred in finding her residual functional capacity for the full range of light work, despite the contrary assessment of her treating physician, Dr. Brown; the effects of her extreme obesity; and the subjective limitations she testified to, including medication side effects. The undersigned finds this objection to the finding of plaintiff's capability to perform the <u>full</u> range of light work to be well founded. As plaintiff notes, none of the RFC assessments of record support such a finding. While defendant argues that

24

the assessment of the consultative examiner, Dr. Davis, is consistent with the full range of light work despite his assignment of a limitation against standing/walking even one hour uninterrupted (Tr. 140), the undersigned must disagree.

Defendant cites the regulatory language that "a job is in this [light] category when it involves sitting most of the time with some pushing and pulling of arm or leg controls," 20 C.F.R. § 404.1567(b), but it is unclear how this language -- which speaks to "a job" that would not otherwise appear to be "light" -- translates to the availability of the full range of light jobs when there is a limitation against prolonged standing. Prior to describing the alternative light job requiring prolonged sitting, this regulation defines the more garden variety of light job as requiring "a good deal of walking or standing," and states that a full or wide range of light work requires "the ability to do substantially all of these activities." Id.; Tr. 23.  The undersigned finds it incontrovertible that Dr. Davis's assessment fits the profile for that range of light work which affords the option to sit or stand as needed, and not the full range of light work.

Plaintiff's professed need to avoid prolonged standing or walking is substantially supported by the assessments of Drs. Davis and Brown.  In the undersigned's view, the ALJ was not justified in finding to the contrary, particularly as he appeared

to rely heavily on Dr. Davis's assessment in making his own RFC finding.

However, the undersigned finds such error to be harmless, in light of the ALJ's explicit finding that plaintiff is able to return to her past relevant sedentary work as a child care agency director (Tr. 23), in which secretarial job as performed generally and, it appears, particularly by plaintiff (Tr. 322, 324), she would not be required to stand or walk for prolonged periods. Of course, plaintiff's ability to perform this past sedentary job is adequately established only to the extent that the ALJ was justified in rejecting Dr. Brown's more dire opinion of plaintiff's capabilities and the similarly dire testimony of plaintiff herself, and then only if plaintiff's obesity was appropriately considered vis-à-vis Social Security Ruling 02-1p. Plaintiff urges the Court to reject the ALJ's decision for its insufficiency on both of these fronts.

Regarding Dr. Brown's assessment that, due to plaintiff's history of asthma, low back pain, and inner ear trouble, she is limited to lifting a maximum of three pounds, standing one hour out of eight, and sitting one and a half hours out of eight (Tr. 152-53), the ALJ declined to give controlling weight to this opinion, explaining that:

> . . . it is inconsistent with the objective medical
> evidence and with the claimant's complaints. There is
> no evidence of any vision, auditory or speech
> impairments. There is no evidence of treatment for an

26

> inner ear problem, there is no evidence of recent
> treatment for asthma and there is very little treatment
> for lower back pain.  Dr. Brown reported on August 29,
> 2002 that the claimant was clinically stable and
> without complaint (Exhibit 9F).

(Tr. 19)

The undersigned finds no error in the rejection of this opinion that plaintiff essentially needs to lie down and avoid all exertion for two-thirds of every day.  As the ALJ explained, this level of restriction is inconsistent with the remainder of the medical record, including the notable absence therefrom of any particularly significant records of pain management efforts or other treatment involving asthma or inner ear symptoms. Plaintiff's citation to a treatment record listing the diagnoses that describe her past medical history (Docket Entry No. 16 at 2 (citing Tr. 241)), many of which were medically controlled or occurred remotely, is unavailing.  Houston v. Sec'y of Health & Human Servs., 736 F.2d 365, 366-67 (6th Cir. 1984).  Dr. Brown's assessment and plaintiff's hearing testimony, while generally consistent with one another, are also plainly inconsistent with the 2002 assessments of examining consultant Dr. Davis (Tr. 138-43) and nonexamining consultant Dr. Juliao (Tr. 221-26), as well as plaintiff's history of attempting to lift a futon over a fence in 2003 (Tr. 275) and attempting to lift a heavy trunk in 2004 (Tr. 241).  In short, substantial evidence supports the decision to discount the assessment of Dr. Brown.

27

Moreover, between plaintiff's occasional heavy lifting endeavors and the relatively unimpressive medical record, it cannot be said that the evidence supporting the ALJ's credibility finding is insubstantial. Though plaintiff testified that the combination of her medication-induced drowsiness and her residual physical symptoms left her, in essence, largely bedridden and unable to climb stairs or even walk short distances without resting, this testimony is flatly contradicted by an abundance of record medical evidence. This evidence, as cited by the ALJ (Tr. 19-21), reveals multiple physical examinations yielding largely normal results, particularly on musculoskeletal and neurological testing, in addition to plaintiff's repeated denial of symptoms such as shortness of breath, back and neck pain, and muscle weakness. Plaintiff's testimony describing "unbearable," "constant" pain (Tr. 327-28) is not supported by the objective medical record, including the prescription of relatively mild pain relievers such as Darvocet and naprosyn, or her ability to attempt heavy lifting. The ALJ did not err in failing to fully credit this unsupported testimony.

Finally, the undersigned finds no merit in the argument that the ALJ failed to consider the impact of plaintiff's obesity on her ability to work. The ALJ explicitly found plaintiff's obesity to be a severe impairment -- indeed, her *only* severe impairment -- and noted Dr. Oguntolu's observation of a

28

corresponding loss of functional ability.[6]  It is clear that plaintiff's obesity was given due consideration in the determination of her residual functional capacity for only light work, since the other impairments considered in combination with obesity were lightly regarded as "only mild cardiomyopathy, emphysema and degenerative disc disease[;] [s]he frequently denies cardiac chest pain and shortness of breath[, and] all examinations show full range of motion in all joints."  (Tr. 21) Plaintiff does not argue that the effects of her obesity take any other impairment to the level of severity described in any listing, and SSR 02-1p does not require any more extensive scrutiny than was given here to the effects of obesity-related symptoms on plaintiff's RFC.

In sum, the undersigned finds substantial evidentiary support for the Commissioner's decision in this matter, and therefore concludes that the decision should be affirmed.

_____

[6]The ALJ recited that "[p]ulmonary function testing on July 23, 2003 revealed moderate restrictive abnormality with mild reversible obstructive airway and a reduced functional capacity consistent with obesity."  (Tr. 20; see also Tr. 230)

Case 3:06-cv-00686  Document 20  Filed 05/27/08  Page 29 of 30 PageID #: 107

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 27th day of May, 2008.

      s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE